## Wytheville.

### JONES AND OTHERS v. CRUMPLER AND OTHERS.

June 8, 1916.

Absent, Cardwell, J.

1. TRUSTS AND TRUSTEES—*Sale of Crops by Landowner for Producer—Identification of Producer's Share—Attachments.*—Where crops are produced on the lands of another under an agreement that the land owner is to have a certain share, and the producer, whether a tenant or cropper, is to have the residue, and the whole of the crop is shipped to market in the name of the land owner who is to pay over to the producer his share thereof, and the crops are marked in the name of the producer and are capable of identification, showing the share to which the producer is entitled, the land owner is a mere trustee, with power to sell the producer's share and to turn over the proceeds to him, and such proceeds are not subject to attachment by creditors of the land owner.

2. BILLS AND NOTES—*Draft—Acceptance of Separate Paper.*—Under section 134 of the negotiable instruments act, a letter from the drawee of a draft to the drawer thereof, saying: "We phoned the bank to send over your draft yesterday. They will send it over today" does not bind the drawee in favor of a person to whom the letter was never shown, or who did not, on the faith thereof, receive the draft for value.

3. BILLS AND NOTES—*Draft—Assignment—Non Acceptance—Lien on Fund.*—Under section 127 of the negotiable instruments act, the draft in controversy did not operate as an assignment of the funds in the hands of the drawee available for its payment, and the drawee, not having accepted the same, is not liable thereon, nor has the holder any lien on, title to, or ownership in the fund of the drawer in the hands of the drawee.

Error to a judgment of the Court of Law and Chancery of the city of Norfolk, in an attachment proceeding in which other creditors intervened. Judgment for intervenors. Plaintiff assigns error.

*Affirmed in Part.*

The opinion states the case.

*W. T. Shannonhouse* and *E. R. F. Wells*, for the plaintiffs in error.

*N. T. Green* and *Williams, Tunstall & Thom*, for the defendants in error.

HARRISON, J., delivered the opinion of the court.

This attachment proceeding was instituted by W. M. Jones to garnishee in the hands of Eure & Co. certain funds belonging to his debtor, E. L. Crumpler, Curtis Pope, Samuel Bunn, John Hunt, Richard Hunt, William Catten and the Citizens Bank of Windsor intervened in these proceedings, claiming that the fund attached belonged to them severally in various amounts. Upon the hearing the lower court sustained the claim of the intervenors and directed the garnishees to pay the fund, $798.79, attached in their hands, to the several internevors, as follows: To Curtis Pope $235.00; to Samuel Bunn $144.00; to William Catten $192.00; to John and Richard Hunt $97.48; and to the Citizens Bank of Windsor the balance of $130.31.

The facts in regard to the claims, respectively, of Pope, Bunn, Catten and the two Hunts show that E. L. Crumpler, the defendant, who lived in North Carolina and was engaged in farming, had an understanding with these five colored men, whereby they were to make crops of cotton and peanuts on his land. Crumpler was to be reimbursed for all advances made by him, and the balance was to be divided equally, one half to himself and the other half to the five colored men. This arrangement was carried out by

the parties, and in December, 1914, Crumpler shipped in his own name the crops which had been raised, consisting of twenty-seven bales of cotton and one hundred and eighty-seven bags of peanuts, to Z. V. Eure & Co., commission merchants of Norfolk, Virginia, to be sold. The sum garnisheed in the hands of Eure & Co., was the balance of the proceeds of the sale of these crops.

The contention of the plaintiff in error is that the five colored intervenors were not, as claimed, tenants, but were merely croppers, or employees, who had no interest in the proceeds of the crops which they produced on Crumpler's land, but only had a personal claim against Crumpler for the amount he owed them for tending and producing the crops.

It is, under the facts of this case, immaterial whether these men were tenants or croppers of Crumpler. The evidence clearly shows that only one half of the twenty-seven bales of cotton and the one hundred and eighty-seven bags of peanuts belonged to Crumpler, and that the remaining half thereof belonged to the five men mentioned. After the cotton and peanuts had been made ready for shipment to market, the cotton raised by each of these men was marked in their names and capable of identification, showing that some of them were entitled to one half of certain cotton and others to one half of certain other bales, all of which was kept separate and distinct by the marking. With respect to these crops, the relation between Crumpler and those who raised them was not merely that of debtor and creditor; he occupied the relation of trustee, with power only to sell their half of the crops and to turn the proceeds over to them. The fund attached, being part of the proceeds of the sale of the crops, belonged to these intervenors, so far as necessary to

satisfy their respective interests in their one-half of the crops, and the lower court properly ordered Eure & Co., the stakeholder, to pay the same to them to that extent.

The remaining question is as to the action of the lower court in paying to the Citizens Bank of Windsor $130.31, the balance of the fund attached after satisfying the other claims that have been considered.

The bank insisted that it had a claim *in rem* to the money in the hands of Eure & Co., because it had cashed Crumpler's draft on Eure & Co., for $350, which it says was done on the faith of a representation made by Crumpler to its cashier, that Eure & Co., had written him a letter promising to honor his draft for that amount. An examination of that letter, which is dated December 2, 1914, shows that Eure & Co., told Crumpler that it would be all right for him to draw on them for $350 against a certain amount of peanuts and cotton, provided bills of lading for the same were in their hands before the draft was made. When the Bank of Windsor cashed this draft for Crumpler, the bills of lading for the crops had not been sent to Eure & Co.; they had not even been issued by the railroad company. So that the conditions that Eure & Co. prescribed were not complied with. Crumpler did not show the letter of Eure & Co. to the bank, nor does it appear that he told them of the conditions mentioned in it. Eure & Co. did not know the bank in the transaction. Its letter was addressed to Crumpler, and there was no privity between them and the bank. The letter of Eure & Co. did not constitute an acceptance of the draft, it only authorized Crumpler to draw on them upon certain conditions which were not complied with when the bank cashed the draft. Under

such circumstances the bank had no claim either against the fund in the hands of Eure & Co. or against them personally. They had not accepted the draft, or assumed any responsibility with reference to it. This draft was presented several times to Eure & Co. and as often refused, because Crumpler had not sent them the bills of lading for the cotton and peanuts. On December 17, 1914, after Eure & Co. had received the bills of lading, they wrote Crumpler a letter · to which they added a postscript saying: "We phoned the bank to send over your draft yesterday. They will send it over today." This does not, as contended, constitute an acceptance of the draft by Eure & Co. It is at most an expression from which might be implied an intention to pay the draft when it was sent over. If, however, it could be considered as an acceptance, it would not be binding upon Eure & Co. under section 134 of the negotiable instruments law, Code, sec. 2841-a, which provides that, "Where an acceptance is written on a paper other than the bill itself, it does not bind the acceptor except in favor of a person to whom it is shown and who on the faith thereof receives the bill for value." It is not pretended that this postscript was ever shown to the Bank of Windsor, or that the bank ever advanced, on the faith of it, any money on the draft. On the contrary, it appears that the postscript was not written until two weeks after the Bank of Windsor had parted with the possession of the draft.

We are further of opinion that, under section 127 of the negotiable instruments law, this draft did not operate, as contended, as an assignment *pro tanto* of the money in the hands of Eure & Co.

That section provides as follows: "A bill of itself does not operate as an assigment of the funds in the

hands of the drawee available for the payment thereof, and the drawee is not liable on the bill unless and until he accepts the same."

It is, we think, quite clear that the cashing of this draft by the Bank of Windsor in North Carolina did not give it any lien on, title to, or ownership in the fund belonging to Crumpler in the hands of Eure & Co. This being so, the claim of the bank is inferior to the claim of the appellant attaching creditor.

It follows that the lower court erred in not directing the balance of $130.31, in the hands of Eure & Co., to be paid to the appellant. The judgment complained of, in favor of Curtis Pope, Samuel Bunn, William Catten and John and Richard Hunt must be affirmed, and that in favor of the Citizens Bank of Windsor must be reversed; and this court will enter such judgment as the lower court ought to have entered in favor of the plaintiff in error for $130.31, the balance in the hands of Eure & Co., the garnishees, after satisfying the claims of the five intervenors mentioned who had the prior right.

*Affirmed in Part.*